The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons that have any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. That's the United States, and that's Honorable Ford. Mr. Nichols. Good morning, Your Honor. I'm Steve Nichols here with my law partner, Francis Wilburn. Franny and I represent the appellant in this matter, NCO Financial Systems. Your Honor, this matter comes to the Court for, I think, the fourth time now. Previously, it was before the Court, and this Court reversed the District Courts of Maryland's opinion that was rendered at a hearing in October of 2017 that we refer to as the damages trial. The Court was remanded to the District Court for further fact findings regarding the two issues that had prompted the reversal of the case. The vacating of the case and remanding of the case. First of all, the District Court was directed to consider whether or not the generalized marketing of Montgomery Parks, this building generally, was commercially reasonable. And then it was also directed to determine whether or not the NCO space was allowed to participate in that generalized marketing effort on an equal footing with the arrest of the available space in the building. So, for the reasons that we explain in our brief, the Court committed legal error on both of those issues. As to the general... Can I just ask you a question? And maybe it's just semantics. Is it important to your understanding of our first opinion that those are two distinct inquiries and not part of the same general... I didn't understand the original opinion as sort of setting out here are two distinct questions. I thought it was more where they're commercially reasonable efforts to just let the building as a whole under the circumstances. And one of the things one would consider certainly is you want to make sure nobody is singling out the NCO space for disfavored treatment. But does it matter to your argument or should I just not worry about this? Your Honor, it's just a way of conceptualizing the nub of the issues. And those really... I think that everything that we're pointing to as an error has to do with one of those two issues. And I appreciate that, Your Honor. But as to the general marketing, all the Court did on remand was... First of all, we had asked for a reopening of the evidence, which was denied. So all the Court was doing here on remand after remand hearing was simply hearing, in essence, oral argument concerning all the evidence at the previous damages trial seen in light of this Court's prior opinion and what we call NCO2. That is the last opinion, the last opinion of this Court. And as to whether or not the building generally was marketed, all the District Court did was cited its previous findings that significant efforts were made to market the building generally but that they were unfortunately unsuccessful. That's it. And I could read from the Court's opinion. It said, the District Court adopts its previous fact findings regarding the significant efforts, including creation of brochures, hanging banners, etc. That passage is the totality of the fact findings and reasoning of the District Court for why the marketing of the building generally was commercially reasonable. And in that portion where the Court discusses that generalized marketing effort, it doesn't even find that that marketing was commercially reasonable. Now, at the end of the hearing, at the very end of the hearing, it says, I find that the marketing effort was commercially reasonable. But there's no way of telling, Your Honor, why those facts, those significant efforts were commercially reasonable. You have to speculate. And the irony of it is, is that precisely these significant efforts were found to be not commercially reasonable at the conclusion of the damages trial. We have a completely opposite result looking at the same efforts that were found to be lacking. And they were found to be lacking, Your Honor, for reasons that have nothing to do with leaving the property off of CoStar or discriminating against the NCO space. At the prior trial, the Court has specifically found that the generalized marketing effort of the building generally had to take into account the specific strengths and weaknesses of this building. This building is a very idiosyncratic building. It is grossly unattractive for probably 99 percent of potential users of commercial real estate. It's an office building outside Baltimore's Central Business District. It's not a skyscraper. It's a 10-story building with these huge floor plates. So basically, almost nobody is going to have window offices. It's located in a marginal neighborhood outside of the Central Business District. Law firms, accounting firms, the kind of people that use office space are not going to want to be there. Everything you said, I think, is what raises a serious question. When your client breached the agreement, breached it in that context, and the Montgomery Park has tried to lease that building with a lot of difficulty. There's, what, 400,000 square feet were open when your space came open. And the question is now, how do you market the additional 100,000 square feet so you have 500,000 empty square feet? And what we did note in the beginning is that they don't have to focus just on yours and ignore the rest of the building. But the question is, was there any real market for that except in a very narrow range? And one of the items that struck me coming into this argument was that during this damage period, they were able to lease only 7,000 square feet. And that means out of the 500,000. So they weren't able to market or rent any of that 400,000 square feet, too. And the court did list all the people that toured and all the people that came. And you didn't read the whole list, but the list is pretty lengthy as to what they did. And as you know, the burden's on you to show that this was not commercially reasonable. But your observation that this is a difficult resale falls on your back because of the breach. And so it was a risky breach because it's a hard, I mean, at least to mitigate the rental because Montgomery Park had quite a benefit in having the lease with you. It's hard to get somebody to. I know where that building is, and I think you're very clear in the way you describe it.  And so the question is now, should you, in light of that fact, get relief from the payment of the rent? The whole issue here is whether the rent should be reduced by a fair to mitigate. But they didn't sit on it. They did quite a bit. Your Honor, may I respond? Of course, of course. I'm just making some observations about this. Those are very fair points. The first point I want to make is NCO's expert acknowledged that and said, you can't market this property the way you do a normal property. The only way you can market this is specifically targeting that 1% of the market. And that 1% of the market is not located in the Baltimore area. You've got to put out email blasts to people in India, to worldwide. And that's one of the reasons you have to put this thing on customer. Didn't the court find that it was listed internationally? You need to seek out users located in India. My question was, didn't the court find that it was, in fact, listed internationally? No, no, Your Honor. The court specifically found that it did not, it criticized the marketing plan because it was not targeted to this tiny sliver of the market that really might be interested in the bill. The court, on remand, simply ignored that finding. And it got from significant efforts to the conclusion of commercially reasonable without acknowledging these other fact findings in the other direction that it had found at the conclusion of the damages trial on the same evidence. Now, the second thing, Your Honor, you raise the issue of, well, even if they perhaps had used reasonable efforts, it wouldn't have mattered because they couldn't rent space at the building anyway. But, Your Honor, if we were to win ultimately on this issue, the case would not be over. Then we would have further proceedings in which it would be NCO's burden of proof of showing that had you used commercially reasonable efforts, you would have rented out the space, let's say, in two years so that the five years of the damages period, it would reduce your damages. So, honestly, Your Honor, you could rule in our favor. We could, the case, you could either render in our favor or send it back on remand, direct the court to fix its errors. We could win on all of that and still face a significant judgment precisely because of the reasons that you identify, Your Honor. But we're entitled to do that. We're entitled to have fact findings that are not contradictory and that take into account the substantial evidence that goes the other way. And the district court did not do that, Your Honor. And we cite the reasons for that in our brief. I'm not going to belabor that. I will also, let's go to the other issue, which is whether or not. I'm sorry. Can I just, in terms of the district court's explanation. So, I do understand your argument. And the district court didn't say a lot about this. But I do think maybe the context matters here because in the first, after the first damages trial, right, the district court says, look, you did a fine job. You did a perfectly adequate job as to the building as a whole. But the problem is you didn't single out the NCO space for special treatment. And we say, the court says, that's not the rule. And so it goes back to the district court. And the district court effectively says, I sort of agree with you. Look, like I said last time, the renting of the building as a whole was not the problem. That was fine. I'm just repeating my prior holding. But I guess given the context and the nature of the remand, why was it necessary to say much more than that? Well, because the court was directed to determine whether or not the marketing efforts of the building as a whole were commercially reasonable. And apart from the fact that the NCO space was discriminated against, the district court at the end of that first damages trial made specific findings that the property generally was not marketed in a commercially reasonable manner. You've got to deal with that issue. And the district court simply did not do that, Your Honor. Now, as to- Let me follow up on Harris's question. If the building as a whole was reasonably marketed, but the particular space that we're talking about here, the 100,000 square feet, was not marketed. Why, in that circumstance, wouldn't we expect more than a lease of 7,000 square feet out of 500,000 vacant space? In other words, if their reasonable efforts yielded only 7,000 square feet, the question is, are you carrying your burden that using any other method would have led- a reasonable commercial method- would have led to any better result? You're basically described a white elephant. A large building that's square, that's a large footprint, it's not in a- it's in a sort of quasi-industrial area. Your Honor, just to repeat my prior argument, it was not a white elephant for 1% of the market. It was extremely valuable for the correct users. They didn't target the potential tenants for this building, and the court specifically found that it was not commercially reasonable, at least in part, for that reason. And we don't hear- Well, the court found it as to the 100,000 square feet, but the court did not find it as to the whole building. It did. It absolutely found it as to the whole building. We cite the passages where it mentioned it needed to come up with a tailored marketing plan taking into account the strengths and the weaknesses of this generally. Now, as to CoStar, Your Honor, I want to point out something really quickly. Undisputed that CoStar- that this property was left off of CoStar. Both of the party's experts opined that putting the property on CoStar is a necessary step in any commercial leasing. That gets to my whole point of my questions, is the 400,000 square feet was on CoStar. And they didn't want to undermine the display or the appearance of the building and the space by showing another 100,000 square feet vacant. But if that's so, then you would expect- if that was so critical, then you would expect they would have been able to market the other 400,000 square feet. And they haven't been. In other words, commercially reasonable steps of using CoStar with respect to the rest of the building did not yield any results. And I don't know why if you added another 100,000 square feet to what they were still unable to rent would have improved your situation at all. May I respond? I'm out of time. Yeah, you may. Just really quickly, Your Honor. You're in essence, Judge Niemeyer, asking why the prior panel remanded the case in the first place. Because after all, reasonable efforts to mitigate the damages wouldn't have mattered anyway. So I think we have the law of the case that somehow this does matter. And they left it off of CoStar. Your brief and your position has generally been that was basically the most fatal aspect. It's not listing on CoStar. And there was an explanation given as to why they didn't. They thought it would market better without listing on CoStar. But my question is, if you're right about that, that CoStar was this site where it really would have made a difference, then you would have expected a difference. And there was no difference. In other words, the rest of the building has not been leased during this period either. Well, 7,000 square feet. But again, Your Honor, whether departing from the standard of commercial reasonableness in that matter was in effect immaterial is something that was supposed to be tried in a further proceeding. And that's where we would get into that.  But this is not the place. You can't say it wouldn't have mattered if the court below had done what it was supposed to do on remand. Before the court right now, it's simply whether or not the court did make adequate fact findings. And for the reasons we talk about in our brief, they didn't. Thank you, Mr. Nichols. Thank you. Mr. Stover? Yes, Your Honor. May it please the court. On page five of its opinion, the court had quoted a portion of Judge Russell's opinion in which he found as a fact that Montgomery Park engaged in significant efforts to lease the Montgomery Park space in general. And this court, in its decision, said that on remand, the district court should consider all the relevant evidence, including evidence concerning Montgomery Park's generalized marketing efforts to determine whether Montgomery Park had exercised reasonable care in trying to lease the building. And that's exactly what Judge Russell did. He received written submissions from both parties. He heard oral argument, extensive oral argument, from both parties. He found as a fact that Montgomery Park had, in fact, based upon all of the evidence, exercised reasonable commercial standards to lease the entire building. He began by adopting his prior findings regarding those significant efforts. He then went on. He didn't stop there. He went on. He said he noted that tours were given of all of the space, including the NCO space. He pointed out that Collier's, an international brokerage firm, was retained. And I'm sure my colleague made an inadvertent error because Judge Russell specifically noted, and I'll quote, when you combine the hiring of Collier's International, which is an international brokerage firm, which is designed to lease space, which provided notice nationally and even internationally that the space was available. So he hired one of the foremost brokerage firms in the world to lease the space. Frankly, when you look at it, most commercial landlords hire a Collier's. That's it. They hope Collier's can rent the space. But that's not what Montgomery Park did. Montgomery Park undertook a myriad of activities to, in fact, lease the space. In fact, they're all outlined on pages 9 through 19 of our brief. And on pages 20 and 21 of our brief, we refer to the testimony of NCO's own expert. And what happened in that testimony was I asked the expert, is, and I listed each of the activities, the generalized activities that Montgomery Park had undertaken. And for each one, their expert acknowledged it was a commercially reasonable thing to do. So we have all of the activities that were done. Their own expert on pages 20 and 21 of our brief states each one is a commercially reasonable thing to do. These are the subsidiary facts upon which Judge Russell was able to render his factual determination based on those subsidiary facts that, indeed, Montgomery Park had exercised reasonable care. But, Mr. Goldberg, the record wasn't enlarged, was it? Was counsel correct that the judge did not open the record up for new evidence? That is correct, Your Honor. So everything that you're recounting to the court today was before the judge before that, before the remand, correct? That is correct. So can you help me with where does the judge explain this change? The facts were the same. We did remand it. And it seemed to me maybe the focus couldn't be exclusively on it had to be one designed particularly for NCO. And maybe it looked too heavily in that direction. But changing, making it a broader look at what's commercially reasonable doesn't mean that you can ignore all the evidence that made you want to say that that was required to be focused on NCO. What does the court explain that? The court explains that on Joint Appendix 2439, Your Honor, because what the court basically points out on that page is we have potentially conflicting evidence. There is evidence that things were done and potentially evidence things were not done. And what Judge Russell points out, he says, can a person engage in commercially reasonable efforts and not do certain things to advertise a particular piece of property? In other words, you cannot do something that may some other industrious broker would do and still be commercially reasonable. And he points out it's a sliding scale. He uses an analogy. He says just like the sliding scale of legal malpractice, for example, attorneys can file certain pleadings that one lawyer may say are absolutely necessary and another may say, well, they're really not. But that doesn't constitute legal malpractice. So what he's saying is, yes, he recognized, and I'll point out later in my argument where he does recognize, that there are not all facts on one side of the scale. There are facts on both sides. And simply because you don't do everything that might be done doesn't constitute a failure to exercise reasonable care to record a point. But where does he explain that it's not required to particularize it for NCO, which he found before? What he was saying is that, well, you look at everything that was done, the balance, we know that. But where does it explain that somehow, for example, you could put a sign out on the front that says lease space for lease, and that's all. That would apply to everybody in the building. Well, at first he said, well, that wouldn't help with 400,000 that NCO has. So you need to do something to particularize it. Came back here, we said, no, you can't look just at that. You have to look at broadly what they did generally and particularly whether or not they were disfavored. But it seems to me, I'm just talking about what you read from the record. Yes, that's in the record, but it doesn't quite to me explain how you just whisk away this very heavy finding that they needed to particularize it to them and do something. You know, it's like saying this, for example, you say you got 400,000 square feet of space. And you say, you know what, my plan is I go to all these places, and mostly every place you go to be proactive, want small space from 5,000 to 10,000 square feet, that's all. And you could say, well, that's not disfavored. I do that, generally I do that. So where does it explain that NCO is covered in that kind of marketing plan? Well, what he basically says is that by leasing all space or attempting to lease all space in the building, there is obviously an effort to lease the NCO space. He pointed out in his reiteration that there were tours of the NCO space. There were meetings regarding NCO space. So that's included in both what he had said prior to the last appeal and subsequent to the last appeal. So he points out that, yes, indeed, there are attempts to deal with that subject. And with regard to the written plan, again, what we have is the plaintiff's own expert, as an example, saying that, and this is on page 20 of our brief, it's subparagraph F, conducting monthly meetings to discuss marketing strategy is a commercially reasonable thing to do. And Judge Russell found in his opinion in remand, the district court found that there were, quote, meetings regarding leasing of Montgomery Park space in general. So the only question is, did they have to be written down? There is no question because he found as a fact that there were meetings to discuss the leasing of space in Montgomery Park. Those meetings were outlined by Mr. Haas, who was the Collier's broker, and an employee of Montgomery Park. And they described in their testimony what the meetings consisted of. So the only issue is not whether they discussed Montgomery Park, not whether they discussed NCO space, but was it written down? That became the issue. And what the court- Can I just- Oh, maybe you're about to answer my question. Go ahead. What the court found as a fact was that, indeed, these did occur. And what the court points out on page 2452 of the joint record appendix is, quote, So what the court points out is he had to make judgments based upon the credibility of the witnesses. The witnesses testified to the meetings. The witnesses testified to what occurred at the meetings. Can I- So I think what your colleague is saying is that in the first damages trial, the judge, as you say, found that there were in-person meetings, but not a written plan. But as your colleague tells it, at least the judge went on to say, and it's not commercially reasonable not to have a written plan. And then he turns around in the second order and says, no, everything's commercially reasonable and doesn't explain why he changed his mind about the importance of having a written plan. Can you just address that particular argument? Yes. When you look at the appendix 1226, when the court found in the first- initially that they needed a written plan, if you look at what the court said the written plan was designed to do, what the court said is the written mark- and this is at 1226- the written marketing plan would include an evaluation of the NCO space. So you understand the judge to just- A list of prospects for the NCO space. Specific timetables and goals for listing the NCO space. And methods for advertising of the NCO space. No written marketing plan was ever created related to the NCO space. He goes on to say that those efforts fell well below what would be considered reasonable commercial efforts by industry standards to lease the NCO space. But what happened is this court reversed because the test wasn't leasing the NCO space in a vacuum. The test was, was there reasonable commercial efforts to lease the building, not just the NCO space? And what Judge Russell found as a fact was that there were meetings, that the meetings were explained by the testimony. He evaluated the testimony and weighed the evidence. And yes, on one side of the scale may be these discussions were not written down. That's on the scale. Also on the scale is there were meetings, which he found as a fact in both of his opinions, that these meetings did occur. He found as a fact that all of these other subsidiary facts had occurred. There was the scale. He had to evaluate all the evidence, not just the written, the written memoranda of the meetings. And so that's what he did. And it's clear from the record, it seems to me, that when he discusses the fact that he had evaluated the credibility of the witnesses, that sort of gets to the argument that's made by NCO, that they say, well, Judge Russell, that it could have been that leasing the space and the CoSTAR issues could have been done in a different way. NCO says that Montgomery Park's explanation was dishonest. NCO says Montgomery Park's explanation was concocted. Well, they can argue that all they want. They argued that to Judge Russell. But Judge Russell found as a fact that, indeed, it was not dishonest. It was not concocted. It was a legitimate concern about stigmatizing the building. And so these were issues that he had to weigh. And all of the issues that the court is presenting today were discussed before Judge Russell, both in written memoranda and in the argument. If you're stigmatizing the building, that was the problem. Theoretically, 80% of your effort ought to have been for NCO, right? I'm sorry? 80% of your effort to release should have been for NCO's interest, right? You had 500,000 empty. They had 400,000. My math, I think, is right. 80% should have been for their effort. I think they had 100,000. They had 100,000? NCO just had 100,000. 100,000, but the total, not the 100,000. That's wrong. So 10% should have been, right? Well, whatever. Well, when a landlord leases a building, it depends on who walks in the door. A customer walks in the door, they may say, well, I don't want all of the things you've built out in the NCO space. The next customer walks in the door, he says, I don't want to be on the first floor. I want to be on the fourth floor. I don't think any landlord devotes a percentage of time to any particular space in a building. They deal with who walks in the door, and they deal with getting people interested to walk in the door. And that's essentially what Montgomery Park was doing. They were trying to get people interested. If you look at what we outline on pages 18 and 19, which we list the activities, it's primarily activities that interest people in walking in the door. And once they walk in the door, the evidence was that Montgomery Park included the NCO space with other space that they would show the potential customer. So I understand the mathematics of the thing, but in reality, you get somebody in the door, you show them the spaces that are available. The fact of the matter is that after doing all of these activities, hiring one of the leading brokers literally in the world for this type of activity, they were able to lease 7,000 square feet. So they couldn't even lease their own space, much less lease any other space. And so that's really where we wind up there. I note that council has not addressed the damages issue that has been raised in the brief. I'll just comment on it very briefly. The lease was itself very clear. It's clear and unambiguous. There's not even an argument that it's ambiguous. The lease provides both for the late fees and the default interest in two different paragraphs. The late fees are to be calculated based on 10 days after the breach, the default interest on 30 days. The lease was executed by NCO, a bill collector. Of all people who understand what written documents are, a bill collector is one of them. They were represented by legal counsel in the negotiation lease, and they have utterly ignored the statute which controls, which is the commercial law article, which is section 14-1315. The commercial law article was passed in order to make it very clear that provisions in a lease which provide for both default interest and for late fee are legal, are enforceable, are not a penalty, and so forth. So there's been no argument here yet today. But as a practical matter, if there's a complaint about the terms of the statute, they can go to the mayoral legislature, not to this court. Yes, ma'am. I understand your argument about the lease and everything. I mean, I can see it does look like a really big damages award, right? Because this all started because there was like a $70,000 shortfall in the termination payment, right? And now instead of getting back the $70,000, Montgomery Park is getting what, like $10 million? And so you can see why it does seem sort of like a windfall. But maybe you can explain to me why I know that seems like the appropriate amount of damages. It is a very appropriate amount because of the following. They breached the lease. I have not seen any case anywhere which says the amount of money they breached the lease makes a difference in what the lease says. The lease provides for a default. This is your remedy. That was negotiated and signed. But second, let's look at what NCO could have done. NCO, when they realized they made a mistake, what could they have done? They could have come back into the building and made use of the building. It wasn't our fault that they didn't come back and make use of the building. They chose not to. They could have gone out and tried to sublease their space if we weren't being successful. They didn't do that. I'll tell you what they did do. The reason this case is NCO versus Montgomery Park, what they did do was go to Philadelphia, file a lawsuit against Montgomery Park claiming that Montgomery Park had defrauded them and that Montgomery Park was leasing less space to them than the lease provided. That case was transferred back to Maryland. We tried the case. At the end of the plaintiff's case, Judge Russell threw that case out. So what they tried to do, instead of moving back, instead of trying to sublease the building, they sued. They're an aggressive outfit. They sued us claiming we defrauded them. So, yes, there were things they could have done. So is it unfair that they have to pay the rent that they contractually were obligated to pay? I suggest no. If there's no other questions, that's all I have. Thank you. Thank you, Mr. Goldberg. Mr. Nichols? Your Honor, really briefly, I realize that my time is, I always want to say, short. But in any event, I want the court to remember, though, on the issue of leaving the property off at CoStar, the prior opinion said Montgomery Park was not obligated to depart from its existing business plan. And the argument here is that, well, there was a conscious decision not to put property on CoStar to avoid tainting the building. At the initial damages trial, the court discounted that argument. It said that's not a good reason. But what the court went on to say was, if that was your reason, because you owe the special duty to NCO, you should have listed NCO and taken someone else off. That's what the court said. But that seems to me is sort of foreclosed by the panel decision in NCO2. The point I want to make, Your Honor, is that this decision to leave property off of CoStar was not Montgomery Park's business plan. They did it for the first time ever with the NCO space. But not just to the NCO space, right? And your argument, I do understand your argument before the district court, as I sort of tried to track this and tell me if I got it wrong, was the one thing Montgomery Park can't do is single out the NCO space. And that's what they did here because every other inch, I think you said, every other inch of available space is on CoStar. And the district court rejected that argument on the facts, as I understand it, and said that is not true. There's other space that's not on CoStar. All of the space that became available during the damages period didn't get listed. And so are you contesting that fact-finding or do you want us to apply a different legal standard than what you were arguing to the district court? Our position is not that they didn't put a total of 11,000 square foot. They left that off of CoStar as well. All of that space came open after NCO had defaulted and this whole thing interrupted. The suggestion is that this was simply a fig leaf, basically, to try to justify the fact that they had left NCO off of CoStar. That's not what the district court thought, right? It seemed to me the district court made something in the nature of a credibility finding saying that's not what happened. They just decided. They didn't want to stigmatize the building. And they treated NCO the same way they treated other space that became available at around the same time. But whether or not that was part of their existing business plan when NCO defaulted is a legal issue. There is no evidence that they were holding any property off of CoStar. Do you think the rule is the business plan, they have to continue to apply whatever business plan they had in place? They can never change the business plan, even if they change it for everyone. Even if they had taken everyone off CoStar, you can't do that. Because at the time, they were putting people on CoStar. That's exactly correct, Your Honor. Counsel, you ignore the dynamics of business and what's going on. I mean, they have to respond to the markets and what they believe in the district court. Apparently, you know, it's thought that this was reasonable and it was credible to make the judgment as to whether or not this would make it looks like an empty building and somebody is not desirable. I mean, that's and we have to find clear and find the fact, right? Well, we're, Your Honor, both experts of both parties stated and testified that putting property on CoStar is a necessary element of any commercially reasonable business plan. Both sides said that. The district court didn't even take notice of that, Your Honor. At a minimum, we're sitting here speculating why the district court ignored both parties experts who both testified that putting the property on CoStar is necessary in any commercially reasonable marketing of commercial space. So you're saying that since it was undisputed among experts, the court just substituted its lay judgment, even though we're jurists, lay judgment for what the expert, both experts say is required. That's right. There's no evidence out there. There's no testimony from anyone saying, you know, it's okay to leave property off of CoStar. There's just nothing in the record to that. And if the court, if the panel has any other questions for me, I'm happy to address them. I have just one question. And, you know, because it is your rebuttal, but, you know, your colleague says on the other side that, I guess you would say a physician healed thyself. Obviously, the responsibility to use commercial reasonable efforts to try to release that space. But what about saying that wasn't your interest to try to find somebody or to do some things, which include moving back in and all those? I'm not going to go into the litigation we talked about as we respond to that. But what about that? Should that be in the mix in terms of looking at this totality of the circumstances? Your Honor, I'm not familiar with that as a principle of Maryland law. Maryland law requires landlords to commercially mitigate for their defaulting tenants. There's nothing that I'm familiar with that says, and the tenant has to pitch in to that effort. But in this record, there's nothing that you offered to say, hey, why don't you check this place here? And nothing in the record like that, right? I'm not saying you're required, but is Mr. Goldberg correct? There's nothing like that in the record? I can see that. Okay. But it wound up being almost, what, $10 million at stake. It seemed like he may behoove you even if there's no principle of law you said that says you have to. Well, Your Honor, as we sit here in hindsight. That's not hindsight. Yeah, you know that position all along was that you're defaulting on this. You know what your rent was all the way, taking it all the way out to where it would end. That's just arithmetic, right? Well, it's just not a legal, it doesn't detract from the landlord's obligation to mitigate. I understand. All right. Anything further to go? I'll give you a minute to wrap up. The other thing is there were, in addition to all of that, there were specific findings at the end of the damages trial of discrimination against the NCO space apart from CoStar. And the district court made specific fact findings that Montgomery Park steered prospects away from the NCO space in favor of other space that was available at the building that wasn't accruing rent like the NCO space was. So those were specific fact findings. And there's about 20 pages of the transcript of the remand hearing where I take the court item by item by item by item through all of those instances of intentional discrimination that the court had found at the conclusion of the damages trial was intentional discrimination. And it simply wasn't addressed. This is, it's not only that the court ignored all of these instances of steering, but the court itself had found that potential tenants were intentionally steered away from the NCO space and simply doesn't address it in its decision. All right. Thank you, Your Honor. Thank you, Mr. Nichols, Mr. Goldberg, for your argument today. We would love to come down and greet you in our normal fashion, but we can't, but nonetheless, we appreciate your being here and your arguments. And we wish you well and be safe. Thank you so much, Your Honor. All right.
judges: Roger L. Gregory, Paul V. Niemeyer, Pamela A. Harris